UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------- x
MOSHE BORUKH,                                    :
                                                 :
                              Plaintiff,         :        MEMORANDUM AND
                                                 :        ORDER
            -against-                            :
                                                 :        No. 24-CV-6022-NRM-JRC
EXPERIAN INFORMATION SOLUTIONS, INC.,            :
                                                 :
                              Defendant.         :
---------------------------------------------------------------------x

JAMES R. CHO, United States Magistrate Judge:

On August 28, 2024, plaintiff Moshe Borukh ("plaintiff") commenced this consumer credit reporting action against defendant Experian Information Solutions, Inc. ("Experian")[1] alleging violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §1681 *et seq*. *See* Compl., Dkt. 1. Currently pending before the Court is Experian's motion to compel arbitration. *See* Mot. to Compel Arbitration, Dkt. 27. For the reasons set forth below, the Court grants Experian's motion to compel and stays the claims against Experian pending arbitration.

**Factual Background**

The following facts are drawn from the Complaint and the evidence submitted in support of the motion. These facts are undisputed unless otherwise noted.

On August 31, 2016, plaintiff enrolled in CreditWorks, "Experian's credit monitoring service provided by [Experian's] affiliate, ConsumerInfo.com, Inc. (which does business as Experian Consumer Services ('ECS')."[2] Mem. of Law in Support of Experian Information

---

[1] Plaintiff also originally brought claims against BMW Financial Services NA, LLC ("BMW Financial"), but those claims were dismissed by stipulation. *See* Order Dismissing Parties dated 9/27/2024.

[2] ECS and Experian are both wholly-owned subsidiaries of Experian Holdings, Inc. Decl. of Dan Smith in Support of Experian Information Solutions, Inc.'s Mot. to Compel Arbitration ("Smith Decl.") ¶ 2, Dkt. 29.

Solutions, Inc.'s Mot. to Compel Arbitration ("Def. Mem.") at 3, 4, Dkt. 28; *see* Smith Decl. ¶ 3. To enroll in CreditWorks, plaintiff had to complete two webforms. Smith Decl. ¶ 3. The first form required plaintiff to enter his name, address, phone number and email address. *Id.* After he did so, plaintiff had to click a "Submit and Continue" button, which brought him to a second webform to complete. *Id.*; First Webform, Dkt. 29-1.

The second webform required plaintiff to enter his social security number, date of birth, and a username and password. Smith Decl. ¶ 3. Below the boxes to enter and confirm his password, was the following disclosure: "By clicking 'Submit Secure Order': I accept and agree to your Terms of Use Agreement, as well as acknowledge receipt of your Privacy Policy and Ad Targeting Policy." *Id.*; Second Webform, Dkt. 29-2. The phrase "Terms of Use Agreement" was a hyperlink in blue font that, if clicked, would have opened a window with the entire text of the Terms of Use Agreement. Smith Decl. ¶ 4; Second Webform. Thus, before clicking the "Submit Secure Order" button, a consumer could view the entire text of the Terms of Use Agreement. Smith Decl. ¶ 4. Immediately below the disclosure was a large purple button that states, "Submit Secure Order." *Id.*

After entering the required information, plaintiff clicked the "Submit Secure Order" button, thereby accepting and agreeing to the Terms of Use Agreement. Smith Decl. ¶ 5; Terms of Use Agreement, revised April 5, 2016, Dkt. 29-3 at ECF pages[3] 2-28. Plaintiff would not have been able to enroll in CreditWorks without clicking that button. Smith Decl. ¶ 5. After enrolling, plaintiff used the CreditWorks membership, including after the effective date of the

---

[3] References to the page numbers generated by the Court's electronic case filing system appear as "ECF page."

version of the Terms of Use Agreement in effect at the time this lawsuit was filed.  *Id.*[4]

Every version of the Terms of Use Agreement that was in effect during plaintiff's enrollment in CreditWorks contains an arbitration agreement, which expressly applies to ECS's affiliates.[5]  *See* Smith Decl. ¶ 6.  During the entirety of plaintiff's enrollment in CreditWorks, defendant Experian has been an affiliate of ECS.  *Id.*

As of January 2019 and thereafter, the arbitration agreement provides that "ECS and you agree to arbitrate all disputes and claims between us arising out of this Agreement directly related to the Services or Websites to the maximum extent permitted by law, except any disputes or claims which under governing law are not subject to arbitration."[6]  Dkt. 29-3 at ECF page 95

---

[4] Under the Terms of Use Agreement, plaintiff agreed to be governed by the then-current version of the Terms of Use Agreement in effect when he accessed the website.  *See* Smith Decl. ¶ 7; Terms of Use Agreement, revised April 5, 2016, Dkt. 29-3 at ECF page 4 ("Each time you order, access or use any of the Services or Websites, you signify your acceptance and agreement, without limitation or qualification, to be bound by the then current Agreement.").

[5] The arbitration clause provides:  "For purposes of this arbitration provision, references to 'ECS,' 'you,' and 'us' shall include our respective parent entities, subsidiaries, affiliates, agents, employees, predecessors in interest, successors and assigns, websites or the foregoing, as well as all authorized or unauthorized users or beneficiaries of Services and/or Websites or information under this or prior Agreements between us relating to Services and/or Websites."  Dkt. 29-3 at ECF page 7 (Terms of Use Agreement, revised April 5, 2016).

The agreement further provides that:  "For the purposes of this agreement, the terms 'we,' 'us' or 'ECS' refer to Consumerinfo.com, Inc., an Experian company (also known as Experian Consumer Services), and referred to as 'Experian' on the Websites, its predecessors in interest, successors and assigns, and any of its third party service providers (including, without limitation, cloud service providers) who ECS uses in connection with the provision of the Services to you."  Dkt. 29-3 at ECF page 2 (Terms of Use Agreement, revised April 5, 2016).

[6] The arbitration agreement also provides that:  "[a]ll issues are for the arbitrator to decide, including the scope and enforceability of this arbitration provision as well as the Agreement's other terms and conditions, and the arbitrator shall have exclusive authority to resolve any dispute relating to the scope and enforceability of this arbitration provision or any other term of this Agreement including, but not limited to any claim that all or any part of this arbitration provision or Agreement is void or voidable."  Dkt. 29-3 at ECF page 8 (Terms of Use Agreement, revised April 5, 2016); *see also* Dkt. 29-3 at ECF page 40 (Terms of Use Agreement, revised July 2, 2024); Dkt. 29-3 at ECF page 96 (Terms of Use Agreement, revised January 8, 2019).

(Terms of Use Agreement, revised January 8, 2019); *see also* Dkt. 29-3 at ECF page 38 (Terms of Use Agreement, revised July 2, 2024). Further, "the agreement to arbitrate includes, but is not limited to: claims arising out of or relating to any aspect of the relationship between us arising out of any Service or Website, whether based in contract, tort, statute (including, without limitation, the Credit Repair Organizations Act) fraud, misrepresentation or any other legal theory;[7] claims that arose before this or any prior Agreement (including, but not limited to, claims relating to advertising); claims that are currently the subject of purported class action litigation . . . and claims that may arise after the termination of this Agreement." Dkt. 29-3 at ECF page 95 (Terms of Use Agreement, revised January 8, 2019); *see also* Dkt. 29-3 at ECF page 39 (Terms of Use, revised July 2, 2024).

Plaintiff concedes that "for the purpose of monitoring [his] Experian credit report . . . [he]

---

[7] The arbitration agreement contained in the version of the Terms of Use Agreement in effect at the time plaintiff enrolled in CreditWorks excluded "any dispute [between Experian and plaintiff] arising out of the Fair Credit Reporting Act (FRCA) relating to the information contained in [plaintiff's] consumer disclosure or report." Smith Decl. ¶ 9. That provision was deleted as reflected in the Terms of Use Agreement in effect in January 2019 and was never added back to the Terms of Use Agreement. *Id.*; Dkt. 29-3 at ECF pages 92-112. Defendant appears to argue that the terms of the arbitration agreement in the 2019 and later versions of the Terms of Use Agreement should govern. Def. Mem. at 5-6. Plaintiff does not challenge defendant's argument. The Court agrees that the later versions of the Terms of Use Agreement should control since every version of the Terms of Use Agreement advised plaintiff that he would be bound by the then-current Terms of Use Agreement each time he "order[ed], access[ed], or use[d]" the website. *See* Smith Decl. ¶ 7; Terms of Use Agreement, revised April 5, 2016, Dkt. 29-3 at ECF page 4 ("Each time you order, access or use any of the Services or Websites, you signify your acceptance and agreement, without limitation or qualification, to be bound by the then current Agreement."). It is undisputed that plaintiff accessed CreditWorks after the 2019 version of the Terms of Use Agreement took effect. *See* Smith Decl. ¶ 5.

The arbitration agreement contained in the version of the Terms of Use Agreement (revised July 2, 2024) in effect at the time plaintiff filed this lawsuit provides: "The agreement to arbitrate includes, but is not limited to, claims brought by you against ECS, whether based in contract, tort, statute (including, without limitation, the Fair Credit Reporting Act and the Credit Repair Organizations Act), for fraud, misrepresentation or any other legal theory; claims arising out of or relating to any aspect of the relationship between us arising out of any Service of Website, claims that arose before this or any prior Agreement (including, but not limited to, claims relating to advertising); claims that are currently the subject of purported class action litigation in which you are not a member of a certified class; and claims that may arise after the termination of this Agreement." Terms of Use Agreement, revised July 2, 2024, Dkt. 29-3 at ECF page 39.

signed up for free credit monitoring at www.experian.com." Decl. of Moshe Borukh ("Borukh Decl.") ¶¶ 3-4, Dkt. 30-2. However, plaintiff avers that he "did not see an arbitration agreement, or any mention of an arbitration agreement, when [he] signed up for [his] online Experian account." *Id.* ¶ 6. He does not "recall" "click[ing] anything . . . indicating that [he] would be waiving [his] right to a jury [trial]." *Id.* ¶ 8. Moreover, plaintiff states that he "never heard of CreditWorks and do[es] not know what Credit Works is." *Id.* ¶ 7.

In March 2023, plaintiff transferred the lease on a 2021 BMW 750i xDrive sedan, which he had financed through BMW Financial. *See* Compl. ¶¶ 57-58. By letter dated March 27, 2023, BMW Financial confirmed the lease transfer and that plaintiff would be responsible only for "the payments, charges, fees, and/or incurred taxes prior to 03/27/2023." *Id.* ¶ 59. In June 2024, plaintiff learned that the transferred BMW lease "was still being reported in his credit file . . . with an outstanding balance of $11,727.00." *Id.* ¶¶ 62-63.

In June 2024, plaintiff disputed the inaccurate information on the BMW tradeline in his credit report by submitting written disputes to Experian, in which he explained that the lease had been transferred and that the reported balance is inaccurate. *Id.* ¶ 66. By letter dated June 21, 2024, Experian responded that after an investigation, it verified that the report was accurate. *Id.* ¶ 69. In July 2024, plaintiff submitted a second dispute to Experian, explaining that the lease was transferred and requesting that Experian reinvestigate and correct the erroneous reporting. *Id.* ¶ 79. On July 27, 2024, plaintiff reviewed his credit file from Experian and discovered that it still reported the lease account with BMW, albeit with a $0 account balance. *Id.* ¶ 84.

## Procedural Background

On August 28, 2024, plaintiff commenced this action alleging violations of the FCRA. *See* Dkt. 1. On October 28, 2024, Experian answered the Complaint asserting various

affirmative defenses, including the affirmative defense that plaintiff's "claims may be subject to arbitration pursuant to a valid and binding arbitration agreement." *See* Answer, Dkt. 15 at ECF page 23. On November 12, 2024, Experian filed a motion to compel arbitration. *See* Dkt. 18. On November 13, 2024, the Honorable Nina R. Morrison denied without prejudice Experian's motion for failure to comply with her individual practice rules. *See* Order dated 11/13/2024. On November 20, 2024, this Court held an initial conference at which Experian's anticipated motion to compel was discussed. *See* Min. Entry dated 11/20/2024. Subsequently, Experian moved to stay discovery and to compel arbitration. *See* Mot. to Stay Disc., Dkt. 23; Mot. to Compel Arbitration, Dkt. 27.

Experian contends that plaintiff agreed to arbitrate the instant FCRA claims. In response, plaintiff argues that Experian has not carried its burden of proving the existence of a valid arbitration agreement. Plaintiff argues that the only evidence Experian submitted is inadmissible and fails to contradict plaintiff's assertion that "he never saw – much less assented to – any [arbitration] agreement." Pl.'s Opp. to Def. Experian Information Solutions, Inc.'s Mot. to Compel Arbitration ("Pl. Opp."), Dkt. 30 at 7.

## Discussion

### I.    Applicable Law

The Federal Arbitration Act ("FAA") "reflects a liberal policy favoring arbitration agreements and places arbitration agreements on the same footing as other contracts." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 73 (2d Cir. 2017) (internal quotation marks and citation omitted). Under the FAA, a written arbitration provision "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract[.]" 9 U.S.C. § 2. "[T]he FAA embodies a national policy favoring arbitration . . . preserv[ing] the parties' ability

to agree to arbitrate, rather than litigate, disputes." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) (internal quotation marks and citation omitted).  If a court finds "that the parties have agreed in writing to arbitrate an issue or issues underlying the district court proceeding," then it will stay court proceedings so that arbitration may "proceed in the manner provided for in such agreement." *Id.*  (quoting 9 U.S.C. § 4).

Section 4 of the FAA provides that a party can petition a district court for an order directing that "arbitration proceed in the manner provided for in such agreement."  9 U.S.C. § 4. However, parties may only be required to arbitrate if they have agreed to do so.  *See Zachman v. Hudson Valley Fed. Credit Union*, 49 F.4th 95, 101 (2d Cir. 2022); *Meyer*, 868 F.3d at 73. Accordingly, the Court must determine whether a valid arbitration agreement exists between the parties.  *See Soliman v. Subway Franchisee Advert. Fund Tr. Ltd.*, 999 F.3d 828, 934 (2d Cir. 2021); *Meyer*, 868 F.3d at 73.  If the Court finds that a valid arbitration agreement exists between the parties, it then considers whether the parties' dispute falls within the scope of the arbitration agreement.  *Meyer*, 868 F.3d at 74.

Motions to compel arbitration under section 4 are analyzed under a similar standard as motions for summary judgment.  *See Meyer*, 868 F.3d at 74; *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003).  "Allegations related to the question of whether the parties formed a valid arbitration agreement . . . are evaluated to determine whether they raise a genuine issue of material fact that must be resolved by a fact-finder at trial."  *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 113 (2d Cir. 2012).  "[W]here the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law, we may rule on the basis of that legal issue and 'avoid the need for further court proceedings.'"  *Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 171 (2d Cir. 2011)

(internal quotation marks and citation omitted).  The court may "consider all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions of file, together with . . . affidavits" and "draw all reasonable inferences in favor of the non-moving party." *Nicosia*, 834 F.3d at 229; *see Meyer*, 868 F.3d at 74.

The party moving to compel arbitration bears the initial burden of establishing that the parties had an agreement to arbitrate.  *See Zachman*, 49 F.4th at 101-02; *Hines v. Overstock.com, Inc.*, 380 F. App'x 22, 24 (2d Cir. 2010).  The party opposing arbitration may not rely only on "general denials of the facts on which the right to arbitration depends." *Oppenheimer & Co., Inc. v. Neidhardt*, 56 F.3d 352, 358 (2d Cir. 1995).  Rather, the party opposing arbitration "must submit evidentiary facts showing that there is a dispute of fact to be tried." *Id.*  If that party raises a genuine issue of fact as to whether there was an agreement to arbitrate, the court must "proceed summarily to the trial thereof."  9 U.S.C. § 4; *see Bensadoun*, 316 F.3d at 175.

Whether an agreement to arbitrate exists is an issue of state contract law.  *See Meyer*, 868 F.3d at 73-74.  Thus, as an initial matter, this Court must determine what state law to apply. *See Levy v. Credit Plus, Inc.*, No. 21-CV-5541, 2023 WL 2644352, at *5 (S.D.N.Y. Mar. 27, 2023).  The applicable agreements are silent as to choice of law, and the parties' moving papers cite exclusively to New York law.  *See* Def. Mem. at 8-9; Pl. Opp. at 6-7, 18.  Where, as here, the parties do not raise choice-of-law as an issue and they exclusively apply New York law, "it can be said that they have consented to the application of the forum state's law." *Scharnikow v. Siracuse*, No. 15-CV-6991, 2016 WL 7480360, at *3 (E.D.N.Y. Dec. 6, 2016) (quoting *Mangual v. Pleas*, No. 02-CV-8311, 2005 WL 2179083, at *2 n.1 (S.D.N.Y. Sept. 8, 2005)), *report and recommendation adopted*, 2016 WL 7480364 (E.D.N.Y. Dec. 29, 2016); *see Alvarez v. Experian*

*Sols., Inc.*, 661 F. Supp. 3d 18, 25 n.3 (E.D.N.Y. Mar. 15, 2023); *Cimillo v. Experian Info. Sols., Inc.*, No. 21-CV-9132, 2023 WL 2473403, at *5 n.6 (S.D.N.Y. Mar. 13, 2023).  In addition, since plaintiff resides in New York, New York law applies here because it "has the most significant contacts with the matter in dispute." *Oestreicher v. Equifax Info. Servs., LLC*, No. 23-CV-239, 2024 WL 1199902, at *4 (E.D.N.Y. Mar. 20, 2024) (applying New York law in the same context); *see DiTella v. TransUnion, LLC*, No. 23-CV-11028, 2024 WL 3594567, at *4 n.4 (S.D.N.Y. July 31, 2024); *Levy*, 2023 WL 2644352, at *5 (same).  Thus, the Court applies New York law.

## II.    Smith Declaration

Plaintiff argues that the only evidence submitted by Experian in support of its argument that an agreement to arbitrate exists is inadmissible.  Plaintiff contends that the declaration of Dan Smith, ECS's Director of Product Operations, is not based on his personal knowledge, as required by applicable law.

Pursuant to Rule 56(c)(4) of the Federal Rules of Civil Procedure, "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).  "A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."  Fed. R. Evid. 602.  "An affiant's conclusions based on personal observations over time, however, may constitute personal knowledge, and an affiant may testify as to the contents of records . . .  reviewed in . . . [an] official capacity.  The test for admissibility is whether a reasonable trier of fact could believe the witness had personal knowledge."  *Searles v. First Fortis Life Ins. Co.*, 98 F. Supp. 2d 456, 461 (S.D.N.Y. 2000) (internal footnotes omitted).  For

example, the personal knowledge of a witness may be inferred based on her position with a company. *See SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 138–39 (2d Cir. 2009) (finding that a witness's affidavit stating that he was a former vice president of the defendants' business and was "fully familiar with the facts and circumstances set forth" therein satisfied the requirements of former Rule 56(e)); *Jordan v. United Cerebral Palsy of N.Y.C., Inc.*, No. 12-CV-5715, 2016 WL 9022502, at *4 (E.D.N.Y. Mar. 31, 2016) (admitting affidavit as proper where affiant did not swear to personal knowledge, on the basis that his role as "Acting Director" of program gave him "primary knowledge" of the information in his declaration), *aff'd*, 682 F. App'x 48 (2d Cir. 2017); *Bank of America, Nat'l Ass'n v. Kamico, Inc.*, No. 11-CV-5255, 2012 WL 1449185, at *6 (S.D.N.Y. Apr. 24, 2012) (holding that there was no question as to the competence of a declaration by the vice president of the plaintiff-company because as a vice president, the witness was both qualified, and duty-bound, to review the relevant business records of the plaintiff before making his affidavit). In addition, "[e]vidence to prove personal knowledge may consist of the witness's own testimony." Fed. R. Evid. 602.

Here, Smith is the Director of Product Operations for ECS, Experian's affiliate. *See* Smith Decl. (Dkt. 29) ¶¶ 1-2. He has been employed by ECS since 2010, where his duties include "supporting the consumer enrollment process into CreditWorks and related services." *Id.* ¶ 1. These duties require him to be "familiar with . . . how consumers enroll, the forms they must complete to enroll, as well as the Terms of Use governing such services." *Id.* He also must be familiar with "ECS's electronic databases that store consumer enrollment information, including the webpages a consumer would have encountered to complete [his or her] enrollment into CreditWorks," including "which buttons the consumer would have clicked on in the enrollment process, and date and time of the consumer's acceptance of the Terms of Use." *Id.*

In his declaration, Smith describes the process plaintiff undertook to enroll in CreditWorks, including the webforms plaintiff filled out, the acceptance button plaintiff clicked agreeing to the Terms of Use. He bases the statements contained in his declaration on his personal knowledge, including a review of the relevant data and documents which ECS maintains as regular business records and "data specific to Plaintiff's membership." *Id.* ¶ 3. In this case, after receiving plaintiff's personally identifiable information, Smith was able to confirm plaintiff's CreditWorks membership information from ECS's databases, including the "date and time of enrollment, and the version of the Terms of Use [he] agreed to." *Id.* ¶ 1.

In response, plaintiff first argues that Smith failed to "provide, or even so much as reference" the documents he relied on in preparing his declaration. *See* Pl. Opp. at 10. However, plaintiff's argument is misplaced because Experian has submitted the webforms described above, and the Terms of Use, including the arbitration agreement. *See* Dkts. 29-1, 29-2, 29-3. Indeed, the exhibits attached to Smith's declaration corroborate the statements contained in his declaration, including screenshots of the webpages that plaintiff would have encountered during the process of enrolling in CreditWorks and the Terms of Use. *See Searles*, 98 F. Supp. 2d at 461-62 ("statements contained in her affidavit are supported by documentary evidence that she would be competent to introduce at trial").

Based on Smith's familiarity with the facts set forth in his declaration in connection with his duties at CreditWorks, including the process by which plaintiff enrolled in CreditWorks, he is competent to testify about his review of the relevant documents. *See Ellis v. Experian Info. Sols., Inc.*, No. 8:24-CV-850, 2024 WL 5319487, at *3-*4 (M.D. Fla. Dec. 23, 2024) (collecting cases), *report and recommendation adopted*, 2025 WL 79637 (M.D. Fla. Jan. 13, 2025); *Hanson v. Experian Info. Sols., Inc.*, No. 1:23-CV-4564, 2024 WL 3509482, at *4-8 (N.D. Ga. July 22,

2024) (overruling plaintiff's objections to rulings denying plaintiff's motion to exclude Smith affidavit and compel discovery and granting defendant's motion to compel arbitration). Plaintiff has not submitted any authority that would require a declarant to submit or identify each document he reviewed.

Second, plaintiff contends that since Smith was not "present with [plaintiff] at th[e] moment" plaintiff enrolled in CreditWorks, Smith could not have personal knowledge of the webpages plaintiff encountered. *See* Pl. Opp. at 11. However, a witness may establish personal knowledge based on a review of business records. *See Avail 1 LLC v. Varlas*, 680 F. Supp. 3d 265, 275 (E.D.N.Y. 2023); *Parker v. Mandarich Law Grp., LLP*, No. 19-CV-6313, 2021 WL 2351177, at *5 (E.D.N.Y. June 9, 2021) ("an affiant may testify as to the contents of records she reviewed in her official capacity"); *Searles*, 98 F. Supp. 2d at 461-62. And, as discussed above, the court may infer a witness' personal knowledge based on his position and role within a company. *See, e.g., Giallanzo v. City of New York*, 630 F. Supp. 3d 439, 458 (S.D.N.Y. 2022) ("Goldberg's senior position with DOT was enough of a basis on which, for purposes of summary judgment, to conclude that he had the familiarity with quotidian payroll records of his agency to explain what the codes thereon signified."); *Searles*, 98 F. Supp. 2d at 461 ("Ms. Duvall's position with Fortis qualified her to review the relevant business materials in an official capacity and make sworn statements based upon those materials."); *see also Avail I*, 680 F. Supp. 3d at 274-75 (affidavit of sole member and manager of plaintiff was based on personal knowledge).

Here, Smith's position and 14-year tenure with the company made him qualified to review the relevant business records and to submit a sworn statement based on those records. *See Mandarich Law Grp.*, 2021 WL 2351177, at *5 ("Because Ms. Whitlatch's affidavit was

based on her review of defendant's business records in her capacity as a partner at Mandarich, the court concludes that Ms. Whitlatch has sufficient personal knowledge to support the sworn statements contained in her affidavit (which are all corroborated by the admissible records)"); *Searles*, 98 F. Supp. 2d at 461-62.

Although plaintiff contends that Smith's declaration is "conclusory" and "speculative," Smith has provided detailed information about his duties and CreditWorks' enrollment process. Those duties include "supporting the customer enrollment process into CreditWorks," which require him to be "familiar with . . . how consumers enroll, the forms they must complete to enroll, as well as the Terms of Use governing such services" and "the webpages [] consumer[s] would have encountered to compete their enrollment into CreditWorks, the personally identifiable information entered when enrolling, which links or buttons the consumers would have clicked on in the enrollment process, and date and time of the consumers' acceptance of the Terms of Use." Smith Decl. ¶ 1.[8]  Plaintiff has not provided any authority for the proposition that a witness must be present when a business record was created in order to testify to its contents.  In contrast, defendant has provided a more than sufficient basis for a reasonable trier of fact to conclude that Smith has personal knowledge of the facts pertaining to plaintiff's enrollment in CreditWorks.  *See Hunt v. Experian Info. Sols. Inc.*, No. 24-CV-348, 2025 WL 104324, at *4 (M.D. Ga. Jan. 15, 2025); *see Scribner v. Trans Union LLC*, 738 F. Supp. 3d 1301, 1305-06 (E.D. Cal. 2024); *Buelna v. Experian Info. Sols., Inc.*, No. 23-CV-724, 2024 WL 3873694, at *3 (N.D. Ind. Aug. 20, 2024).

The same arguments raised by plaintiff here challenging the admissibility of Smith's

---

[8] Plaintiff is correct that "[t]he requirement that affidavits be made on personal knowledge is not satisfied by assertions made 'on information and belief.'"  *See* Pl. Opp. at 8-9.  However, Smith makes no assertions based on "information and belief."

declaration have been rejected by many other courts nationwide. *See, e.g., Hunt*, 2025 WL 104324, at \*4-\*5; *Jones v. Experian Info. Sols., Inc.*, No. 23-CV-3887, 2025 WL 227198, at \*2 (D. Minn. Jan. 7, 2025); *Taylor v. Experian Info. Sols., Inc.*, No. 1:24-CV-2156, 2024 WL 5265371, at \*3-\*5 (N.D. Ga. Dec. 31, 2024), *report and recommendation adopted*, 2025 WL 431630 (N.D. Ga. Jan. 22, 2025); *Buchanan v. Experian Info. Sols., Inc.*, No. 24-CV-793, 2024 WL 4817129, at \*2 (W.D. Pa. Nov. 18, 2024); *Oatway v. Experian Info. Sols., Inc.*, No. 24-CV-523, 2024 WL 4879822, at \*4-\*5 (W.D. Wash. Nov. 25, 2024). Instead, these courts found that Smith's position with ECS and his review of documents was sufficient to establish his personal knowledge. This Court agrees.

The cases cited by plaintiff in which out-of-circuit courts have rejected similar declarations are not binding or persuasive.[9] Indeed, several courts have commented that *Austin*, *Lamonaco*, and *Newton* are "outlier" decisions on the admissibility of corporate witness declarations. *See, e.g., McGuire v. CarMax Bus. Servs. LLC*, No. 1:23-CV-02938, 2024 WL 3897073, at \*13 (D. Colo. Aug. 16, 2024) (citing *Baker v. Experian Info. Sols., Inc.*, No. 1:24-CV-00605, 2024 WL 3082644, at \*2 (S.D. Ind. June 20, 2024)), *report and recommendation adopted,* 2024 WL 4027964 (D. Colo. Sept. 3, 2024); *Scribner*, 2024 WL 3274838, at \*3 (noting that "Plaintiff has also not provided legal authority . . . requiring [Dan] Smith to specifically identify every document on which he may have relied," and finding *Austin* "unavailing"); *Jenkins v. Experian Info. Sols., Inc.*, No. 23-CV-1634, 2024 WL 4100258, at \*2 (E.D. Va. Sept. 6, 2024); *Clark v. Trans Union LLC*, No. 24-CV-783, 2024 WL 4044130, at \*3 (E.D. Cal. Sept. 4, 2024) (finding *Newton* "unpersuasive and against the weight of authority").

---

[9] *See* Pl. Opp. at 12-16 (citing *Austin v. Equifax Info. Servs., LLC*, Civil Action No. 3:22-CV-707, 2023 WL8646275, at \*7 (E.D. Va. Dec. 13, 2023); *Newton v. Experian Info. Sols., Inc.*, No. CV 623-059, 2024 WL 3451895 (S.D. Ga. July 18, 2024); *Lamonaco v. Experian Info. Sols., Inc.*, No. 6:23-CV-1326, 2024 WL 1703112 (M.D. Fla. Apr. 19, 2024)).

In addition, *Austin* and *Lamonaco* involved a different declarant, who was not Smith.  In *Austin*, the court found that declarant's "job description was too ambiguous to present a finding that [he] had personal knowledge."  2023 WL 8646275, at *2, *4 (declarant statement that he was "familiar with, among other things, the marketing, advertising and sales of CIC consumer credit products" was insufficient to show personal knowledge).  Similarly, the declarant in *Lamonaco* did not "describe what sort of account data CIC keeps and was available for [the declarant] to review."  2024 WL 1703112, at *5.

In contrast, here, Smith retrieved plaintiff's CreditWorks membership information and confirmed his membership details, such as the date and time of enrollment and the version of the Terms of Use plaintiff accepted.  Smith Decl. ¶ 1.  Smith further described his familiarity with the enrollment process, including the specific pathways followed by a consumer and buttons or links clicked.  Moreover, here, unlike in *Lamonaco*, plaintiff admitted to accessing defendant's website or signing up for a credit monitoring account.  *See* Borukh Decl. ¶¶ 3-4 ("I have had an online Experian account since in or around 2016 solely for the purpose of monitoring my Experian credit report. . . .  I signed up for free credit monitoring at www.experian.com."); *see also Lamonaco*, 2024 WL 1703112, at *5 (distinguishing cases where plaintiff admitted to signing up for an account).

## III.    Agreement to Arbitrate

The next question before the Court is whether there is a valid agreement to arbitrate.  *See Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 67-68 (2019); *Holick v. Cellular Sales of New York, LLC*, 802 F.3d 391, 394 (2d Cir. 2015).  The party seeking arbitration bears the burden of proving by a preponderance of the evidence that a valid arbitration agreement exists.  *See Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional de Venezuela*, 991 F.2d

42, 46 (2d Cir. 1993); *Biggs v. Midland Credit Mgmt., Inc.*, No. 17-CV-340, 2018 WL 1225539, at *8 (E.D.N.Y. Mar. 9, 2018). "Whether one can be bound by an arbitration clause is usually determined by looking at generally accepted principles of contract law." *Gold v. Deutsche Aktiengesellschaft*, 365 F.3d 144, 149 (2d Cir. 2004); *see Exp. Indus. & Terminal Corp. v. N.Y. State Dep't of Transp.*, 93 N.Y.2d 584, 589 (1999). Accordingly, "a party is bound by the provisions of a contract that he signs, unless he can show special circumstances that would relieve him of such an obligation." *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 845 (2d Cir. 1987); *see Gillman v. Chase Manhattan Bank, N.A.*, 73 N.Y.2d 1, 11 (1988).

A valid arbitration agreement requires "a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement." *Exp. Indus. & Terminal Corp.*, 93 N.Y.2d at 589. A contract that is created online "does not fundamentally change[] the analysis; a party may accept the offer of terms presented on a screen simply by clicking to indicate assent." *Oestreicher*, 2024 WL 1199902, at *4 (internal citations omitted); *see Soliman v. Subway Franchisee Advert. Fund Tr., Ltd.*, 999 F.3d 828, 839 (2d Cir. 2021) ("[W]hile new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract."). In this context, the court must determine whether "notice of the arbitration provision was reasonably conspicuous and manifestation of assent unambiguous as a matter of law." *Meyer*, 868 F.3d at 76. In determining whether notice was reasonably conspicuous, the Court must take the "perspective of a reasonably prudent [computer] user." *Id.* at 77.

Defendant argues that when plaintiff enrolled in CreditWorks, plaintiff agreed to the Terms of Use, which included an arbitration agreement. Defendant contends that plaintiff had clear notice of the Terms of Use when he enrolled, he was warned that he was agreeing to be

16

bound by the Terms of Use, and he clicked the "Submit Secure Order" button thereby manifesting his assent to the Terms of Use.  Def. Mem. at 9.

Plaintiff does not dispute Smith's description of the CreditWorks enrollment process, nor does he deny that he clicked the button to agree to the Terms of Use.  Instead, plaintiff states only that he "did not see an arbitration agreement . . . when he signed up" for his "online Experian account."  *See* Borukh Decl. ¶ 6.  Plaintiff further argues that the clickwrap agreement at issue here "is insufficient to establish mutual assent from users under the laws of New York."  Pl. Opp. at 17-18.

However, whether plaintiff recalls seeing the Terms of Use and reading them is not determinative of whether he agreed to the Terms of Use.  *See Meyer*, 868 F.3d at 80; *see Cimillo*, 2023 WL 2473403, at *6 (finding plaintiff's declaration "insufficient to create a genuine issue of material fact"); *Flores v. Chime Fin., Inc.,* No. 21-CV-4735, 2022 WL 873252, at *5 (S.D.N.Y. Mar. 23, 2022) (plaintiff's declaration "does not create an issue of fact as to whether she assented to the contract's terms").  Plaintiff was on clear notice that by enrolling in CreditWorks, he agreed to the Terms of Use based on the design and language used on the webpages.  *See Meyer*, 868 F.3d at 78.  As discussed below, based on the undisputed evidence that plaintiff enrolled in CreditWorks and would have had to accept the Terms of Use to complete his enrollment, Experian has established that plaintiff manifested his assent to the Terms of Use.

"Courts routinely uphold clickwrap agreements," "which require users to click an 'I agree' box after being presented with a list of terms and conditions of use," "for the principal reason that the user has affirmatively assented to the terms of agreement by clicking 'I agree.'"  *Meyer*, 868 F.3d at 75 (citations omitted).  In examining whether a consumer assented to the terms of a web-based contract, courts "look to the design and content of the relevant interface to

determine if the contract terms were presented to the offeree in a way that would put the offeree on inquiry notice of such terms." *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 289 (2d Cir. 2019).

In *Meyer*,[10] the Second Circuit held that a similar account creation page in the Uber smartphone application provided reasonably conspicuous notice. 868 F.3d at 78; *see also Hamm v. Capsule Corp.*, No. 22-CV-5435, 2022 WL 4468028, at *3 (S.D.N.Y. Sept. 26, 2022) (finding reasonably conspicuous notice on account creation page). The account creation page in *Meyer*, included a "Register" button, and underneath the button, the screen stated, "By creating an Uber account you agree to the TERMS OF SERVICE & PRIVACY POLICY." *Meyer*, 868 F.3d at 76. The Second Circuit found that the account creation page provided reasonably conspicuous notice to a consumer. 868 F.3d at 78.

Similarly, when enrolling in CreditWorks, plaintiff was provided the following disclosure: "By clicking 'Submit Secure Order': I accept and agree to your Terms of Use Agreement, as well as acknowledge receipt of your Privacy Policy and Ad Targeting Policy." Smith Decl. ¶ 3. The phrase "Terms of Use Agreement" in the disclosure was off-set in bold blue text and, if clicked, would have presented the consumer with the full text of the Terms of Use, including the arbitration agreement. *Id.* ¶ 4. Immediately below the disclosure was a large "Submit Secure Order" button in purple. *Id.* The webform, the disclosure and the "Submit Secure Order" button appeared on a single webpage. *Id.*

Here, like in *Meyer*, the close proximity between the notice of the Terms of Use and the "Submit Secure Order" button would have made clear to "[a] reasonable user . . . that by clicking the registration button, he was agreeing to the terms and conditions accessible via the

---

[10] In *Meyer*, the Second Circuit applied California law, but noted that "New York and California apply substantially similar rules for determining whether the parties have mutually assented to a contract term." 868 F.3d at 74 (internal quotation marks and citation omitted).

hyperlink, whether he clicked on the hyperlink or not." *Meyer*, 868 F.3d at 79–80.[11]  The webpage provided sufficient notice that by clicking on the sign up button, the user was accepting and agreeing to the Terms of Use.  This is "a clear prompt directing users" to read the Terms of Use and "signaling that their acceptance of the benefit of registration would be subject to contractual terms."  *Id.* at 79.  In addition, the Terms of Use are "spatially coupled with the mechanism for manifesting assent—*i.e.*, the [Submit Secure Order] button" and "notice of the [Terms of Use] is provided simultaneously to enrollment, thereby connecting the contractual terms to the services to which they apply."  *Meyer*, 868 F.3d at 78.

The webpage is "uncluttered" and "[t]he entire screen is visible at once."  *Id.*  In sum, the conspicuousness and placement of the Terms of Use hyperlink, along with the general design, provided plaintiff with reasonably conspicuous notice of the arbitration agreement.  Thus, when plaintiff clicked the button to create his CreditWorks account, he unambiguously manifested his assent to the arbitration agreement in the Terms of Use.  *See id.* at 79–80; *see also Flores v. Chime Fin., Inc.*, 2022 WL 873252, at *5 (S.D.N.Y. Mar. 23, 2022) (plaintiff could not have enrolled "without affirmatively agreeing to the terms and conditions on the page with the clickwrap agreement, and accordingly, no reasonable trier of fact could find that she did not assent to the arbitration").

Although plaintiff again relies on several out-of-circuit decisions, the Second Circuit's decision in *Meyer* controls here.  *See* Pl. Opp. at 17-21 (citing *Austin*;[12] *Sgouros v. TransUnion*

---

[11] "[A] reasonably prudent . . . user knows that text that is highlighted in blue and underlined is hyperlinked to another webpage where additional information will be found."  *Meyer*, 868 F.3d at 77-78.

[12] In *Driskill v. Experian Info. Sols. Inc.*, No. 24-CV-583, 2024 WL 4453292 (N.D. Cal. Oct. 8, 2024), the court held that "*Austin* is irreconcilable with *Meeks*, and every other case in this Circuit that has evaluated the enrollment process into CreditWorks."  *Id*. at *6; *see Oatway*, 2024 WL 4879822, at *5-6 (same).

*Corp.*, 817 F.3d 1029 (7th Cir. 2016)[13]).  Indeed, several district courts in this Circuit have found a valid agreement to arbitrate based on the same CreditWorks enrollment process.  *See Ditella*, 2024 WL 3594567, at *5; *Levy*, 2023 WL 2644352, at *7; *Cimilio*, 2023 WL 2473403, at *6; *accord Domer*, 116 F.4th at 699-700 (consumer's click of submit button "unambiguously gave her assent to the arbitration provision").  Thus, the Court finds that defendant has carried its burden of establishing that a valid agreement to arbitrate exists.

## IV.    Plaintiff is a Party to the Arbitration Agreement

Plaintiff does not appear to dispute that Experian is an affiliate of ECS and would have the right to enforce the parties' arbitration agreement.  Nevertheless, the Court notes that plaintiff is a party to the arbitration agreement contained in the Terms of Use.  The "Overview and Acceptance of Terms" section defines ECS to include its affiliates, such as Experian.  Dkt. 29-3 at ECF page 2; *see also* Smith Decl. ¶ 6.  In addition, the arbitration agreement defines ECS to include its affiliates.  Dkt. 29-3 at ECF page 7.  Further, Smith avers that defendant is an affiliate of ECS and that both entities share a common parent.  *See* Smith Decl. ¶¶ 2, 6.

As one court observed, "[t]he word 'Experian' appears over 240 times in the [Terms of Use]."  *See Oestreicher*, 2024 WL 1199902, at *5.  Accordingly, as an affiliate of ECS, Experian is included within the definition of ECS under the arbitration agreement and is a party to the contract.  *See Ditella*, 2024 WL 3594567, at *6; *Levy*, 2023 WL 2644352, at *6; *Cimilio*, 2023

---

[13] In *Domer v. Menard, Inc.*, 116 F.4th 686 (7th Cir. 2024), the Seventh Circuit distinguished *Sgouros*, where the webpage said "nothing about contractual terms."  *Id.* at 697.  The *Domer* court found that the webpage at issue there was different because it "advises users that by completing a purchase they are agreeing to the Terms of Order, which included the arbitration agreement."  *Id.*  ("It explicitly tells the user: 'Please note: . . . By submitting your order you accept our Terms of Order.'").  Likewise, here, CreditWorks' webpage states:  "By clicking 'Submit Secure Order':  I accept and agree to your Terms of Use Agreement, as well as acknowledge receipt of your Privacy Policy and Ad Targeting Policy."  Smith Decl. ¶ 3.  In addition, *Domer* relies heavily on the Second Circuit's decision in *Meyer*, which was decided after *Sgouros*.

WL 2473403, at *5 n.7; *accord Meeks v. Experian Info. Servs., Inc.*, No. 21-17023, 2022 WL 17958634, at *2 (9th Cir. Dec. 27, 2022).

## V.     Scope of the Arbitration Agreement

Finally, plaintiff does not dispute that the arbitration agreement delegates the issue of arbitrability to the arbitrator.  "Parties to an arbitration agreement can . . . 'agree to arbitrate gateway questions of arbitrability,'" *Gingras v. Think Fin., Inc.*, 922 F.3d 112, 126 (2d Cir. 2019) (quoting *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010)), including "whether the arbitration agreement applies to a particular dispute," *DDK Hotels, LLC v. Williams-Sonoma, Inc.*, 6 F.4th 308, 317 (2d Cir. 2021).

"Courts should not assume that the parties agreed to arbitrate arbitrability unless there is clea[r] and unmistakabl[e] evidence that they did so." *Id.* (internal citations and quotation marks omitted).  In determining the parties' intent, "the arbitration agreement is determinative." *DDK Hotels*, 6 F.4th at 318.  "Broad language expressing an intention to arbitrate all aspects of all disputes supports the inference of an intention to arbitrate arbitrability." *Metro. Life Ins. Co. Bucsek*, 919 F.3d 184, 191 (2d Cir. 2019).

Here, the arbitration agreement provides that "[a]ll issues are for the arbitrator to decide, including the scope and enforceability of this arbitration provision as well as the Agreement's other terms and conditions."  Dkt. 29-3 at ECF page 8 (Terms of Use Agreement, revised April 5, 2016); *see also* Dkt. 29-3 at ECF page 40 (Terms of Use Agreement, revised July 2, 2024). The Court finds that this language constitutes a clear and unmistakable delegation clause and delegates the exclusive authority to resolve all issues to the arbitrator, including the scope and enforceability of the arbitration provision. *See Ditella*, 2024 WL 3594567, at *7; *Cimilio*, 2023 WL 2473403, at *8; *Alvarez*, 661 F. Supp. 3d at 28.

## VI.  Motion to Stay

Experian further requests that the Court stay these proceedings pending the arbitration proceeding.  Under Second Circuit law, "[t]he district court must stay proceedings once it is satisfied that the parties have agreed in writing to arbitrate an issue or issues underlying the district court proceeding."  *Nicosia*, 834 F.3d at 229.  Accordingly, the Court stays this litigation because the Court has determined that the parties agreed to arbitrate this dispute.

## Conclusion

For the reasons set forth above, the Court grants defendant's motion to compel arbitration.  In addition, the Court stays the action pending completion of arbitration.

**SO ORDERED**

Dated: Brooklyn, New York
      April 28, 2025

s/ James R. Cho
James R. Cho
United States Magistrate Judge
